IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

PATRICIA J. CARTER,

                    Plaintiff,

          vs.

DOUGLAS COUNTY, NEBRASKA, a Political
Subdivision,

                    Defendant.

**8:22CV422**

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS**

A former employee of the Douglas County, Nebraska, Treasurer's Office has sued the County for retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Nebraska Fair Employment Practice Act (NFEPA). Filing 8. She alleges that after she complained about alleged discrimination and harassment based on race by the Douglas County Treasurer,[1] he retaliated by taking disciplinary action against her and later terminating her. Filing 8.[2] This case is now before the Court on the County's Motion for Summary Judgment asserting that as a matter of law the former employee cannot establish either of her retaliation claims. Filing 64. For the reasons set out below, the Court grants the County's Motion for Summary Judgment.

## I.   INTRODUCTION

### A.   Factual Background

The factual background stated here is drawn from the parties' statements of facts in support of and opposition to summary judgment unless facts necessary to context are found only elsewhere

---

[1] Both the Plaintiff and Douglas County Treasurer John Ewing are African-American.

[2] Plaintiff also brought a claim pursuant to 42 U.S.C. § 1983 alleging violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution against both the county and the county treasurer. Filing 11. However, this Court granted Defendants' Motion for Partial Dismissal as to Plaintiff's equal protection claim. Filing 14 at 12. Thus, the only remaining defendant is the county, and the remaining claims are the Title VII and NFEPA retaliation claims.

in the record. The parties have asserted that a plethora of facts are material to the disposition of the pending Motion for Summary Judgment. Specifically, Defendant Douglas County asserts 190 purportedly undisputed material factual statements, several involving multiple facts, Filing 66 at 1–28, while Plaintiff Patricia J. Carter asserts 189, Filing 69 at 44–63.[3] The Court has no intention of setting out every fact or factual dispute presented in the parties' statements of facts and responses to them because a great many of those facts and factual disputes are not material. Instead, the Court will set out a smaller body of facts and factual disputes that the Court finds is dispositive of the County's Motion for Summary Judgment. *See Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (explaining that material facts are ones "that might affect the outcome of the suit under the governing law" (internal quotations and citations omitted)). The factual statements set out here are undisputed unless otherwise indicated.

1. *The Parties*

Carter started working at the Douglas County Treasurer's Office in July 2007 as the Senior Director of Accounting and Auditing for the Accounting Division of the Treasurer's Office. Filing 69 at 1 (¶ 1). John Ewing, the Douglas County Treasurer, created the position of Senior Director of Accounting and Auditing and specifically asked Carter to apply for the position. Filing 69 at 1 (¶ 2). Carter's duties as the Senior Director of Accounting and Auditing included accounting, reporting, report reviewing, working on the budget (including year-end spending), audits, writing policies, and cash counts. Filing 69 at 2 (¶ 3). Carter held the third highest ranking position in the Douglas County Treasurer's office. Filing 72 at 9 (¶ 34). Douglas County is a political subdivision of the State of Nebraska and is an employer within the meaning of Title VII. Filing 8 at 3 (¶ 10).

---

[3] The Court will cite factual statements from Filing 69, which contains both Defendant's Statement of Undisputed Material Facts and Plaintiff's responses, and from Filing 72, which contains both Plaintiff's Statement of Additional Material Facts and Defendant's responses.

Carter alleged in her Amended Complaint that Ewing is "a black male." Filing 8 at 3 (¶ 12). She alleged in her statement of facts in opposition to summary judgment that non-party Jane Alexander, the Chief Deputy Treasurer, and non-party Mandy Kincaid, the Assistant Chief Deputy Treasurer, "are not African-American." Filing 72 at 9 (¶ 35). However, there is no indication of Carter's race in Carter's Amended Complaint, Filing 8, her responses to Defendant's statement of facts, Filing 69, or her own statement of facts in opposition to summary judgment, Filing 72. However, in her Opposition to Defendants' Motion for Partial Dismissal Carter identified herself as "an African-American." Filing 12 at 3.[4] These facts are material because Carter alleges in her Amended Complaint that her protected activity included her filing of a formal "Douglas County Employee Complaint Questionnaire" alleging that certain conduct by the County was "discriminatory based on Ms. Carter's race." Filing 8 at 4 (¶ 19).[5]

In 2008 and 2009, Carter's work performance was rated between commendable and superior on her performance appraisals. Filing 69 at 2 (¶ 4). The parties dispute whether Carter's position was always part of the Administration of the Treasurer's Office or was transferred from the Accounting Division to Administration after Carter's 2009 performance appraisal. Filing 69 at 2 (¶ 4). That dispute is not material, because Carter was part of the Administration at the times relevant here. There are no performance appraisals for Carter after 2009. Filing 69 at 2 (¶ 4). There are also no instances of Carter receiving workplace counseling, reprimands, or suspensions for poor performance or behavior prior to 2021. Filing 72 at 3 (¶ 12).

---

[4] Carter believes that she is older than Kincaid and Alexander, Filing 72 at 9 (¶ 36), but this belief is not material to this lawsuit, because Carter has not asserted an age discrimination or retaliation claim under the Age Discrimination in Employment Act (ADEA) or the NFEPA.

[5] Indeed, this is one of only two references to race in Carter's Amended Complaint. The second is in reference to the now-dismissed equal protection claim alleging that Ewing established, maintained, or enforced policies "that create or foster [a] race or sex discriminatory work environment, by treating African American women adversely different." Filing 8 at 12 (¶ 68).

2. *Events Leading to Carter's Development Plan*

Notwithstanding the lack of evidence of performance problems prior to 2021, it cannot be disputed that friction developed between Carter and other members of the Administration of the Treasurer's Office at least by early 2021 after Alexander replaced the previous Chief Deputy Treasurer. Filing 69 at 5 (¶ 12). Some of that friction arose because Carter received a smaller pay raise than she believed she was promised and one that was smaller than the raises received by Ewing, Alexander, and the previous Chief Deputy. Filing 69 at 5 (¶¶ 13–14). Carter also believed that Ewing "took away her downtown Omaha office," although the County asserts that Carter had both a downtown office and an office at "the Fitz Home" with other executive staff. Filing 72 at 8 (¶ 32). Carter also alleges that Ewing allowed junior non-executives to park in Carter's spot, but the County asserts that executive staff did not have assigned parking spots. Filing 72 at 8 (¶ 33).

Of greater significance was friction over Ewing changing some parameters for Carter's cash counts after the COVID-19 pandemic. Filing 69 at 7–8 (¶ 22). Carter felt "belittled" by these changes because she thought others knew about them before she did and the changes were made without her having any input. Filing 69 at 8 (¶ 24); Filing 72 at 4 (¶ 18). There is no dispute that after a branch managers' meeting on February 9 and 10, 2021, multiple employees reported to Ewing and Kincaid that Carter rolled her eyes as Ewing was speaking about the change in parameters and that she repeatedly flipped her phone over and rolled her eyes when other people were talking. Filing 69 at 8 (¶ 27). There was further friction about Carter's failure to include Alexander in scheduling of cash counts, but Carter contends that she was not required to do so. Filing 69 at 9 (¶ 28). On February 16, 2021, Ewing either told or reiterated to Carter that she was to include Alexander as well as Ewing on emails concerning cash counts. Filing 69 at 10 (¶¶ 32–33). The parties dispute whether Ewing also told Carter during the February 16, 2021, meeting that he would be composing a "development plan" for Carter. Filing 69 at 10–11 (¶ 33). Later that

same day, Carter cancelled all the scheduled cash counts/audits—not just the one week discussed during the February 16, 2021, meeting—by sending an email with "cancelled" in all red over the entire schedule. Filing 69 at 11 (¶ 34). In response to the email, Ewing emailed Carter suggesting a different approach to the email, which would have likely only required the one week to be adjusted. Filing 69 at 11 (¶ 35). Ewing was concerned that Carter's communication appeared to display to others that Carter was angry about the cancellation, and he believed that Carter should have recognized that the cancellation only impacted one date on the schedule. Filing 69 at 11 (¶ 35). On February 18, 2021, Carter failed to include Alexander on an email to Ewing regarding cash counts/audits. Filing 69 at 11 (¶ 36).

On February 19, 2021, Ewing placed Carter on a "development plan," despite Carter's current assertion that she had not been made aware of any performance failures that required improvement prior to that date. Filing 69 at 12 (¶ 37). The development plan was not "discipline"; nevertheless, it included 18 points for improvement. Filing 69 at 12 (¶ 38). Eight of those points were the following: (a) "All audit communications will include [Alexander] and [Ewing]"; (b) "Any audit communications involving the Customer Service Centers will include [Alexander], [Kincaid], and [Ewing]"; (c) "All audits will have a report done with any findings and suggestions for improvement within two business days as directed by [Alexander] and [Ewing] [and] [i]f it is a Customer Service Center [Kincaid] will be included"; (d) "Employees will be treated with dignity and respect"; (e) "You will address the Treasurer, Chief Deputy[,] and Assistant Chief Deputy with respect in verbal communications including active listening"; (f) "All assignments for outside departments or organizations will be presented to the Treasurer and Chief Deputy one week prior to due date"; (g) "All Treasurer[']s office assignment deadlines must be met"; and (h) "Monthly budget updates and encumbrances [are] to be sent by email on the 20th of each month."

Filing 69 at 12–13 (¶ 38) (quoting Filing 67-21 at 1). Carter believed that the development plan was punitive, discriminatory, and harassing on the basis of race and age. Filing 72 at 6 (¶ 24), 7–8 (¶¶ 29–31).

### 3. Events Leading to Carter's Reprimand

Carter did not provide any report of her February 11, 2021, cash count/audit until April 27, 2021, even though she was aware by February 19, 2021, of the two-day deadline in the development plan. Filing 13–14 (¶ 40). In late February or early March of 2021, there was a dispute between the parties about whether Carter could "flex" her lunch hour in order to leave early. Filing 69 at 14 (¶¶ 41). That dispute also involved Carter's request that Ewing not include Alexander on emails about her schedule. Filing 69 at 14–15 (¶¶ 41, 43–44, 46). Ewing responded that Alexander would be part of all discussions as his Chief Deputy, but Carter maintains that the development plan only required her to include Alexander in audit communications. Filing 69 at 15 (¶ 47). On March 3, 2021, Carter was absent, and Ewing and the office manager had difficulty in obtaining information from Carter about whether her absence should be listed as COVID-19 administrative leave or sick leave. Filing 69 at 15–17 (¶¶ 48–52). That dispute included Carter's request during a phone call that she discuss the matter with Ewing later and Ewing's shouted response, "No." Filing 69 at 16 (¶ 52). When Ewing texted Carter with directions to provide Kincaid with information by 5:00 p.m., Carter responded with a prayer. Filing 69 at 17 (¶¶ 53–54). The text of the prayer is not material beyond the fact that it was not responsive to Ewing's request.

Carter did not include Alexander on emails regarding her attendance and schedule on March 8 and 9. Filing 69 at 19 (¶ 62) (also indicating Carter's dispute about whether she was required to do so). On March 9, 2021, Ewing requested that Carter notify him and Alexander of any variance in her schedule. Filing 69 at 19 (¶ 63). Carter still did not include Alexander on emails

regarding her attendance and schedule on March 10 and 11. Filing 69 at 19 (¶ 62) (also indicating Carter's dispute about whether she was required to do so).

On March 11, 2021, Carter, Ewing, and Alexander met to discuss Carter's progress on her development plan, and Carter surreptitiously recorded the meeting. Filing 69 at 20 (¶ 65). The parties do not dispute that the meeting included discussions of communication and respect in the office; the reasons for Carter's March 3rd absence; and Carter's eye-rolling, laughter, and other conduct during meetings that set "a bad tone." Filing 69 at 20–21 (¶¶ 66–69, 71–72, 74–77). Carter laughed multiple times when Ewing and Alexander were trying to speak to her, but Carter contends the laughter was based on nervousness. Filing 69 at 21 (¶ 70). Most critically, during the March 11th meeting, Ewing told Carter,

> Now I'm trying to do the best I can to help you. That's why I put this together. But if you don't work it, Patricia, you're putting me in a spot. Okay? And that means – here's what's going to happen – if I've given you this development plan and I've done everything I can, then I'm going to take the steps that are necessary based on what I talked about with Human Resources and the County Attorney's Office to start the discipline process and you probably will have to be terminated.

Filing 69 at 22 (¶ 78).

On March 12, 2021, Carter was reported to be walking up and down the halls of the Treasurer's Office clapping, snapping, and singing very loudly, and to be playing music loudly in her office and clapping and snapping to it. Filing 69 at 22 (¶ 79). On March 16, 2021, Carter submitted budget information and binders a day late when she had been given two working days to complete them. Filing 69 at 23 (¶ 80). Carter alleges that on Friday, March 12, 2021, she explicitly told Ewing to stop the harassing behavior at the workplace, specifically complaining that Ewing shamed her and that Alexander had to hear Ewing verbally assaulting her. Filing 72 at 10 (¶ 41). The County disputes what Carter told Ewing on March 12, 2021, but that is a matter that the Court will take up below in § II.B.

Also on March 12, 2021, Carter submitted an "Employee Complaint Questionnaire" to Douglas County alleging that the development plan and Ewing's harassing conduct constituted race-based discrimination. Filing 72 at 11 (¶ 42). The County admits that it received a copy of Carter's Employee Complaint Questionnaire on March 15, 2021. Filing 72 at 11 (¶ 43). However, there is no allegation that Ewing knew of this complaint to County Human Resources at that time.

On March 18, 2021, Ewing asked his administrative coordinator to finalize a counseling form for Carter, which was originally dated March 19, 2021. Filing 69 at 23 (¶ 81). On Friday, March 19, 2021, Carter filed a Charge of Discrimination with the Nebraska Equal Employment Opportunity Commission (NEOC) and the EEOC. Filing 72 at 11 (¶ 45), 17 (¶ 66). The Charge outlined alleged discrimination and harassment based on race and age. Filing 72 at 17 (¶ 66). Carter admits that she does not know whether Ewing was aware on March 22, 2021, of any complaints that she had filed alleging discrimination, and Ewing testified that he did not know about any HR or NEOC complaints at that time. Filing 69 at 24 (¶¶ 89–90).

On March 22, 2021, Ewing sent Carter a Supervisor Documentation of Employee Counseling stating that Carter "has missed numerous deadlines," "has not been respectful in her verbal communications," and "has not followed instructions for email communications." Filing 69 at 23 (¶ 82); Filing 72 at 16 (¶ 62). The form states, "This is *NOT A DISCIPLINARY FORM*. This form is to be used only to create a written record that you counseled a particular employee about a specific problem." Filing 70-13 at 2 (emphasis in the original). However, the form also states, "Another incident may result in (circle one): oral or written reprimand," with "written" circled. Filing 70-13 at 2. The form is signed by Ewing but indicates that Carter "refused" to sign it. Filing 70-13 at 2.

On March 22, 2021, Carter attended meetings with Ewing, and during one of those meetings, she asked Ewing why he was part of the budget process. Filing 69 at 23 (¶ 84). She also refused to provide access to her work calendar to the office manager during one of those meetings. Filing 69 at 23 (¶ 84). Carter wore headphones throughout both the meeting of senior staff and the meeting on the budget that day. Filing 69 at 24 (¶ 85). When Ewing wanted to speak to Carter about her counseling, Carter refused multiple times to move to a conference table in Ewing's office. Filing 69 at 24 (¶ 86). After this behavior, Ewing issued a written reprimand to Carter on the afternoon of March 22, 2021. Filing 69 at 24 (¶ 87). The written reprimand described the misconduct at issue as follows:

> The employee in a meeting rudely asked why I was part of the budget process. The employee had on headphones throughout our senior staff meeting and budget meeting and did not appear to be actively listening. The employee was also made aware of the fact that I wanted the administration staff to have access to our calendars and the employee rudely said "No." The employee was asked to move to the table so we could conduct our weekly follow up meeting regarding the development plan and she said no and refused to move after several requests.

Filing 67-26 at 1; Filing 72 at 17 (¶ 68). The written reprimand directed Carter to attend Douglas County's mandatory employee assistance program (EAP). Filing 69 at 24 (¶ 88). Participation in the EAP can be made a requirement for continued employment. Filing 69 at 40 (¶ 173).

### 4. Events Leading to Carter's Suspension

On March 24, 2021, Ewing discovered that Carter had not yet completed a Systems audit that she had been assigned in February 2021 and that, although he had not set an explicit due date, he had instructed Carter to complete her work in a timely manner. Filing 69 at 25 (¶ 91). At some point after March 22, 2021, Ewing also learned that Carter had not yet provided cash count/audit reports to Ewing, Alexander, and Kincaid for her March 18 and 23, 2021, cash counts/audits at two service centers, contrary to the requirements of the development plan. Filing 69 at 25 (¶¶ 92–93).

On March 25, 2021, Ewing asked Jamie Manzitto, the Administrative Coordinator for the Treasurer's Office, to assist him in drafting template discipline documents for Carter to be used for a potential suspension, and Manzitto sent Ewing a copy of a suspension template that same day at approximately 1:19 p.m. Filing 69 at 25 (¶ 94). On March 26, 2021, Manzitto provided Ewing with a finalized pre-disciplinary hearing letter regarding Carter for Ewing's review, although the parties dispute whether that occurred at 8:39 a.m. or 12:14 p.m. Filing 69 at 25 (¶ 95).

Ewing first learned of Carter's NEOC Charge of Discrimination when he received it on March 26, 2021. Filing 72 at 11 (¶ 45); Filing 69 at 41 (¶ 181). The County alleges and Carter admits that Ewing was first made aware of the NEOC charge at 11:59 a.m. on March 26, 2021. Filing 69 at 26 (¶ 96); Filing 72 at 11 (¶ 45). Later in the day on March 26, 2021, Ewing issued the same notice of pre-disciplinary hearing to Carter that he had started preparing the day before. Filing 69 at 26 (¶ 98). The notice stated the pending charges and explanation of evidence as follows:

> It was discovered March 24th that you did not perform the Systems audit as assigned. You completed an audit of the Accounting Division on February 11, 2021 and did not provide an audit report to Jane Alexander and myself. You have completed three customer service center audits and did not complete audit reports as requested. Policy SPN-1-97 is still not completed and was assigned months ago. You stated you did not know you were supposed to write it, but this is not an accurate statement. The budget for systems was turned in one day late. Budget binders I asked for were also turned in one day late. You have not provided any feedback or need for extensions in any of the sited cases. At your pre-disciplinary hearing, you will be given an opportunity to respond to these allegations.

Filing 67-28 at 1. The notice set Carter's pre-disciplinary hearing for April 1, 2021. Filing 69 at 26 (¶ 98). However, Carter was on medical leave from March 29, 2021, through April 25, 2021, so Ewing postponed Carter's pre-disciplinary hearing. Filing 69 at 26 (¶ 99).

On March 29, 2021, Carter amended her Douglas County Complaint Questionnaire to include the counseling form, the written reprimand, and the suspension notice. Filing 72 at 43

(¶ 175); [Filing 69 at 41](#) (¶ 182). On April 14, 2021, Ewing learned that HR was conducting an investigation and wanted to interview him, but he was not told what the investigation was about. [Filing 69 at 26](#) (¶ 100). Carter admits that Ewing did not learn of her HR complaint until April 14, 2021, at the earliest. [Filing 69 at 41](#) (¶ 179). The HR interview with Ewing, which occurred on April 20, 2021, was in relation to Carter's complaints to HR. [Filing 69 at 26](#) (¶ 101).

After Carter returned to work, she attended her pre-disciplinary hearing on April 30, 2021. [Filing 69 at 26](#) (¶ 102). On May 14, 2021, Ewing issued a notice of suspension to Carter for a two-day suspension without pay. [Filing 69 at 27](#) (¶ 103). Ewing cited the following five reasons for the suspension:

  a. Carter had not yet completed a systems audit;

  b. Carter had conducted four cash counts/audits between February 11 and March 23, 2021, and reports for those cash counts/audits were not submitted until April 27, 2021, outside of the 48-hour window ordered by Ewing;

  c. A Treasurer policy – SPN-1-97 – had not been completed by Carter as assigned;

  d. Carter turned in budget information a day late; and

  e. Carter turned in the budget binders a day late.

[Filing 69 at 27](#) (¶ 104). On May 17, 2021, Carter appealed the suspension to the Douglas County Civil Service Commission. [Filing 69 at 27](#) (¶ 105). The Commission heard her appeal on July 13, 2021, and affirmed. [Filing 69 at 27](#) (¶ 108), 29 (¶¶ 112–113). Carter served her suspension on July 19, and 20, 2021. [Filing 69 at 29](#) (¶ 114); [Filing 72 at 32](#) (¶ 117).

  *5.  Events Leading to Carter's Termination*

  In February 2021, well before Carter's suspension was imposed or served, Carter provided encumbrance reports with information that the County contends was outdated, but Carter contends was accurate, because she had to have information from prior to 2017 to reconcile the reports.

Filing 69 at 35 (¶ 143). On February 23, 2021, Alexander forwarded Carter an email from Douglas County purchasing explaining that all encumbrances from 2017 were expired and not available for use. Filing 69 at 35 (¶ 144). On February 25, 2021, Alexander asked Carter to re-run a report that did not include encumbrances prior to 2017. Filing 69 at 35 (¶ 145). On March 8, 2021, Ewing requested that Carter provide a clean list of encumbrances for the last three years with all previous years removed from the report. Filing 69 at 35 (¶ 146) (undisputed part of allegation). Nevertheless, Carter admits that the remainder of the encumbrance reports that she provided after March of 2021 included information dating back to 2003. Filing 69 at 36 (¶ 149).

A series of incidents followed. On April 28, 2021, shortly after Carter returned to work following leave, Kincaid emailed Ewing that Carter's snapping and singing were out of control because she was doing them loudly every time that she left her office, which was distracting to Kincaid and others. Filing 69 at 36 (¶ 150). Kincaid had received numerous complaints from staff about Carter's behavior upon her return from leave. Filing 69 at 36 (¶ 151); *see also* Filing 69 at 39–40 (¶¶ 169–171) (other undisputed instances of complaints about Carter's loud and distracting behavior). On June 14, 2021, Carter refused to enter Alexander's office for a meeting until Ewing told her that her behavior was insubordinate and ordered her to go into Alexander's office. Filing 69 at 36–37 (¶ 152). On June 15, 2021, there were problems with a Zoom meeting that Carter had scheduled, so Carter wanted to cancel the meeting, but Alexander said that it needed to be completed that day. Filing 69 at 38 (¶ 158–160). A Systems staff member suggested using the speaker option on desk phones, but Carter refused to go on speaker, still wanted the meeting to be cancelled, and hung up on Alexander. Filing 69 at 38 (¶¶ 161–163). Ewing emailed Carter asking her to explain the problem and in response to Carter blaming Systems, Ewing told Carter it was a failure of leadership on her part because she did not adapt to unforeseen circumstances. Filing 69

at 39 (¶¶ 166–167). In reply, Carter *inter alia* asked Ewing to "treat [her] with dignity and respect" and included a copied-and-pasted image of Douglas County's Anti-Harassment Policy. Filing 69 at 39 (¶ 167); Filing 72 at 31 (¶ 115); Filing 70-23 at 2.

On August 3, 2021, Carter again refused to continue a discussion that started in Ewing's office in Alexander's office, but Carter asserts that she entered Alexander's office after Ewing ordered her to do so. Filing 69 at 37 (¶¶ 153–156). After this incident, Ewing contacted the EAP because he "was concerned that the program was not being successful." Filing 69 at 40 (¶ 174) (undisputed part). On August 4, 2021, Ewing found out that Carter had revoked her release to the EAP on May 24, 2021, preventing the EAP from disclosing to Ewing whether Carter was still attending and participating in the EAP. Filing 69 at 40 (¶ 174). Based on revocation of the release, Ewing believed that Carter was no longer complying with the mandatory EAP referral, which was a condition of her employment. Filing 69 at 41 (¶ 176).

The parties agree that Carter was responsible for encumbrance reports and working with others to close encumbrances to ensure "an 130 report" as the first step in the budget process for the budget team. Filing 69 at 32 (¶¶ 126–127). The Treasurer's budget fiscal year ended on June 11, in 2021. Filing 69 at 32 (¶ 128). Carter received emails from persons involved in the budget report on May 18, 19, 24, and 27, 2021. Filing 69 at 32–33 (¶¶ 129–132). On June 2, 2021, Carter sent an email providing the budget amount, but including no value or attachments. Filing 69 at 33 (¶ 133). In response to a question about whether there was supposed to be an attachment, Carter emailed, "There is approximately $200,000 in remaining budget appropriation." Filing 69 at 33 (¶ 134). This approximation was not correct, and Carter admits that she has no evidence or factual basis to dispute that she provided an inaccurate budget number. Filing 69 at 34 (¶¶ 136–137). Ewing sought an accurate figure from the County Clerk/Comptroller's office, and the Clerk's

Office provided an estimate of $410,000. Filing 69 at 34 (¶¶ 138–139). On July 21, 2021, "[t]he actual budget amount . . . was $395,000." Filing 69 at 34 (¶ 140). Carter purports to dispute this allegation but her dispute is not about the amount; rather, it states only that "[a]t least by June 10, 2021, at the latest Ewing was aware that the budget calculation provided by Carter was inaccurate." Filing 69 at 34 (¶ 140). Carter admits that had the Treasurer's Office relied on Carter's approximation, "there would have been $200,000 left on the table that it would have had to give up," and that Alexander and Manzitto had to help determine the correct encumbrance value. Filing 69 at 34 (¶¶ 141–142).

The County alleges that Ewing did not discipline Carter for her behaviors or work performance while Carter's appeal of her suspension was pending because Ewing knew that if the suspension was overturned, then any subsequent discipline would need to be adjusted to comply with the Commission's general rule of progressive discipline. Filing 69 at 28 (¶¶ 109–110). Carter disputes these contentions because she further "appealed" her suspension by filing a "petition-in-error" on August 9, 2021. Filing 72 at 32 (¶ 118). Carter alleges that a petition-in-error meant that her suspension was "not final"—even though she had already served it—and because there is no mention of "progressive discipline" in the applicable policy. Filing 69 at 28–30 (¶¶ 109–110, 116). Carter alleges that Ewing learned about the petition-in-error on August 10, 2021, at 6:22 p.m. Filing 69 at 28 (¶ 109). Carter also asserts that Ewing, as the Treasurer, had the authority to terminate employees without a hearing. Filing 69 at 28 (¶ 109).

On August 10, 2021, at 11:23 a.m., about seven hours before Carter alleges Ewing learned of her petition-in-error, Ewing created a document for a notice to Carter of a pre-disciplinary hearing and emailed it to Alexander and Manzitto. Filing 69 at 29 (¶ 115). Ewing provided Carter

with the new notice of pre-disciplinary hearing on August 13, 2021. Filing 69 at 30 (¶ 117). It

states the following specific allegations:

1.  Providing an inaccurate amount of remaining funds to spend in the budget before the end of the fiscal year. Had other employees not corrected this error, the Treasurer's Office would have lost approximately $195,000 in funds.

2.  Failing to provide supporting documentation for your inaccurate estimate of remaining funds despite multiple requests.

3.  Repeatedly providing inaccurate and outdated encumbrance reports despite being asked to provide reports that did not include outdated information from 2017 and later [sic].

4.  Failing to maintain satisfactory working relationships since your last discipline, including refusing to meet with the Chief Deputy in her office, hanging up on a meeting with Systems staff and refusing to rejoin the meeting, slamming doors, and creating disruptions in the office.

5.  Failing to follow through on your mandatory referral to EAP by refusing to further cooperate in EAP after May 24, 2021.

Filing 67-38 at 1; *see also* Filing 69 at 30 (¶ 118) (stating similar grounds but indicating disputes

about precise language); Filing 72 at 32 (¶ 120). Carter attended a pre-disciplinary hearing on

September 17, 2021, and Ewing terminated her on September 29, 2021, in a letter and notice of

findings. Filing 69 at 30–31 (¶¶ 119–120).

Carter appealed her termination to the Civil Service Commission on October 1, 2021.

Filing 69 at 31 (¶ 121). Her appeal hearing was rescheduled twice, but after a hearing, the

Commission affirmed Ewing's decision to terminate Carter's employment. Filing 69 at 31

(¶¶ 122–125).

## B. Procedural Background

Carter filed her original Complaint in this action on December 8, 2022, naming as

defendants both Douglas County and Ewing. Filing 1. Defendants filed a Motion for Partial

Dismissal on February 8, 2022. Filing 6. Carter then filed her First Amended Complaint—which remains her operative pleading—on March 1, 2023, again naming Douglas County and Ewing in his official and individual capacities as defendants. Filing 8. On March 3, 2023, the Court denied as moot Defendants' Motion for Partial Dismissal as to Carter's original Complaint without prejudice to the filing of a motion directed at her First Amended Complaint. Filing 9.

In Carter's First Amended Complaint, Carter's first cause of action alleges retaliation in violation of Title VII against Douglas County. Filing 8 at 10–11 (¶¶ 55–60). Her second cause of action alleges retaliation in violation of the Nebraska Fair Employment Practice Act (NFEPA) against Douglas County. Filing 8 at 11 (¶¶ 61–66). Her third cause of action alleged a claim pursuant to 42 U.S.C. § 1983 for violation of Carter's equal protection rights under the Fourteenth Amendment to the United States Constitution by both Defendants. Filing 8 at 11–12 (¶¶ 67–75).[6]

Defendants filed a renewed Motion for Partial Dismissal of Plaintiff's Amended Complaint on March 14, 2024. Filing 11. On May 26, 2024, the Court granted Defendants' Motion for Partial

---

[6] Carter captioned her third cause of action, "VIOLATION OF 42 U.S.C. § 1983—EQUAL PROTECTION." Filing 8 at 11. Of course, one cannot violate § 1983. As another District Court in the Eighth Circuit recently explained,

> Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 685 (1978). Nevertheless, Title 42, United States Code, Section 1983 provides no substantive rights. See Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Conner, 490 U.S. 386, 393-94 (1989); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979). "One cannot go into court and claim a 'violation of [Section] 1983'—for [Section] 1983 by itself does not protect anyone against anything." Id. at 617. Rather, Section 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; see also Albright, 510 U.S. at 271 (stating that Section 1983 "merely provides a method for vindicating federal rights elsewhere conferred."); Graham, 490 U.S. at 393-94 (same); Maine v. Thiboutot, 448 U.S. 1, 4 (1980) ("Constitution and laws" means Section 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution.). To state a claim under Section 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

McDowell v. Anamosa State Penitentiary, No. 22-CV-1-CJW-KEM, 2022 WL 1202760, at *3 (N.D. Iowa Apr. 22, 2022); see also Doe v. Frakes, No. 8:20CV128, 2022 WL 2373825, at *3 n.6 (D. Neb. June 30, 2022) (quoting McDowell), aff'd, No. 22-2954, 2022 WL 19037650 (8th Cir. Dec. 20, 2022).

Dismissal dismissing Carter's Equal Protection claim. Filing 14 at 12. Thus, Carter's remaining claims were her retaliation claims pursuant to Title VII and NFEPA against the County only.

In due course, the County filed the Motion for Summary Judgment now before the Court. Filing 64. A jury trial in this matter is currently set to begin on March 10, 2025. Filing 62.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

The Court begins its legal analysis with the standards for summary judgment. Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) ("An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." (quotations omitted)). "The court determines materiality [of facts] from the substantive law governing the claim"; thus, only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." *Greater St. Louis Constr. Laborers Welfare Fund v. B.F.W. Contracting, LLC*, 76 F.4th 753, 757 (8th Cir. 2023) (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)); *Rusness*, 31 F.4th at 614 (explaining that material facts are ones "that might affect the outcome of the suit under the governing law" (internal quotations and citations omitted)).

Both the moving and the non-moving party must support their assertions about the presence or absence of genuine factual disputes "by citing to particular parts of materials in the record,

17

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, the parties otherwise bear different burdens at summary judgment.

"The movant has the initial burden of establishing the basis for the motion by identifying 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Jones v. Wellpath, LLC*, 77 F.4th 658, 662 (8th Cir. 2023) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up)). "[T]he moving party may discharge its burden by 'pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case.'" *Washington v. City of St. Louis, Missouri*, 84 F.4th 770, 773 (8th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing Fed. R. Civ. P. 56(a)). "The movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case.'" *Whitworth v. Kling*, 90 F.4th 1215, 1216 (8th Cir. 2024) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996)).

In response to a motion for summary judgment, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). Even though a "party's own testimony is often self-serving," that alone is not grounds for disregarding it entirely as the basis for a genuine issue of material fact. *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (citing *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013)). On the other hand, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to

withstand a motion for summary judgment." *Jones*, 77 F.4th at 663 (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Similarly, "[t]o create a genuine dispute of fact, 'the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Johnson v. Midwest Div. - RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

In deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[A]t summary judgment, it is not the role of the district court to weigh competing evidence or 'attempt to discern the truth of any factual issue.'" *Hall*, 77 F.4th at 1182 (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). "Genuine disputes of material fact are for a factfinder to resolve." *Liberty Ins. Corp.*, 87 F.4th at 889. Instead, "[s]ummary judgment is available when there is 'no genuine issue of material fact' and 'the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [moving party] is entitled to judgment as a matter of law.'" *Liberty Ins. Corp.*, 87 F.4th at 888 (quoting *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020)); *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) ("Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute [as to] those facts." *Johnson*, 88 F.4th at 736 (quoting *Torgerson*, 643 F.3d at 1042).

### B.  The County's Challenge to Carter's "Sham Affidavit"

In its Reply in support of its Motion for Summary Judgment, the County asserts that Carter has attempted to fabricate a genuine issue of material fact "by slipping into her declaration

information she never revealed in nearly 23 months of litigation." Filing 73 at 1. The County

identifies the offending part of Carter's Declaration as paragraph 30, which states the following:

> 30.    On Friday, March 12, 2021, I told Ewing to stop his harassing and
> discriminatory behavior towards me in the workplace. I addressed
> the fact that Ewing shames and verbally assaults me during our
> conversations, and that Alexander had to hear Ewing verbally
> attacking me. I informed him to stop and then filed a complaint with
> HR.

Filing 70-28 at 5 (¶ 30). Carter then relies in part on this paragraph of her declaration as the basis

for the following factual allegation in her statement of material facts:

> 41.    On Friday, March 12, 2021, Carter explicitly told Ewing to stop the
> harassing behavior at the workplace, specifically that Ewing shames
> her, and that Alexander had to hear Ewing verbally assaulting her.

Filing 72 at 10 (¶ 41). This alleged fact is material because Carter's alleged statement to Ewing on

March 12, 2021, could qualify as protected activity that was known to Ewing before Ewing took

the allegedly retaliatory actions of reprimanding Carter on March 22, 2021, Filing 69 at 24 (¶ 87),

and issuing her the pre-disciplinary hearing notice on March 26, 2021, that led to her suspension.

Filing 69 at 26 (¶ 98).

The County argues that this paragraph of Carter's declaration should be stricken because

it is a post-deposition affidavit that contradicts prior testimony to try to create a genuine issue of

material fact. Filing 73 at 2. The County argues that this paragraph of Carter's declaration should

be stricken for the further reason that it states information that Carter failed to disclose as required

under Federal Rule of Civil Procedure 26(a), which warrants the sanction of exclusion under

Federal Rule of Civil Procedure 37(c)(1). Filing 73 at 2.

### 1. Paragraph 30 of Carter's Declaration Is a "Sham"

The County's assertion that Carter's declaration about what she told Ewing on March 12,

2021, contradicts her deposition testimony raises the question of whether Carter has offered a

"sham affidavit." "Typically, sham affidavits appear as a plaintiff's stratagem to defeat summary judgment." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020). As the Eighth Circuit Court of Appeals has explained, "An affidavit is a sham affidavit . . . if it contradicts prior testimony or is a sudden and unexplained revision of testimony that creates an issue of fact where none existed before." *Setchfield v. St. Charles Cnty.*, 109 F.4th 1084, 1091 (8th Cir. 2024) (quoting *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir. 2021)); *see also Edwards v. Skylift, Inc.*, 39 F.4th 1025, 1030 (8th Cir. 2022) ("An affidavit is a sham affidavit if it contradicts prior testimony or is a sudden and unexplained revision of testimony that creates an issue of fact where none existed before." (quoting *Button*, 963 F.3d at 830)). Such a "sham affidavit" should be "disregarded." *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir. 2021). "However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit." *Setchfield*, 109 F.4th at 1091 (quoting *Button*, 963 F.3d at 830); *Edwards*, 39 F.4th at 1030 (quoting this statement from *Button*, 963 F.3d at 830). The clarification should be of a point on which the declarant was previously confused, and it cannot be a "blatant contradiction." *Id.*

Paragraph 30 of Carter's declaration contradicts her prior deposition testimony or—at the very least—is a sudden and unexplained revision of her deposition testimony. *Setchfield*, 109 F.4th at 1091. As the County points out, Carter was asked throughout her deposition about her various complaints, but she answered that she did not know when Ewing became aware of them. *See* Filing 67-2 at 16 (Carter Depo.) (64:20–24) (Carter did not tell Ewing on February 19th that she planned to file a discrimination complaint a month later, but suggested, "If he got into my computer, he might have known"), 17 (66:9–12) (Carter did not know when Ewing became aware of the March 19th NEOC charge), 17 (66:15–19) (Carter did not know when Ewing became aware of the March 29th NEOC charge), 17 (66:23–25) (Carter did not know when Ewing became aware of the March

13th HR complaint), 17 (67:1–14) (Carter did not know when or if Ewing ever became aware of Carter's email communications with Buche, Donnelly, or Commissioner Boyle), 17 (67:23–68:3) (Carter did not know whether Ewing was aware on March 19th that she had filed any complaints of discrimination), 17 (68:19–22) (Carter did not know whether Ewing knew on March 22nd that she had filed a charge of discrimination of any kind), 18 (69:4–16) (Carter knew that Ewing received her charge of discrimination on March 26, 2021, but does not know what time that day), 18 (69:25–70:19) (Carter did not know whether Ewing was aware of her discrimination charges on March 22nd but it was possible that he did). Carter never mentioned an alleged conversation with Ewing on March 12 at which she purportedly told him to stop his harassing and discriminatory behavior.

In further support of her statement of fact at Filing 72 at 10 (¶ 41), Carter relies on a statement she purportedly made to Donnelly, the HR investigator, as recorded in the June 21, 2021, Complaint Summary.[7] Filing 72 at 10 (¶ 41) (citing Ex. 7, p. 4); *see also* Filing 70-7 (Carter's Ex. 7); Filing 67-63 (identical document identified as the County's Ex. G1). The cited part of the Complaint Summary reports Carter's statement,

> This past Friday [March 12, 2021], I did tell John you beat me down and shame me. That is why they're [coworkers] uncomfortable. They have not said that to me, I'm thinking about how I would feel if I were in their shoes.

Filing 67-63 at 4; Filing 70-7 at 4. Notable for its absence is any statement in the Complaint Summary that Carter told Ewing "to stop his harassing and discriminatory behavior towards me in the workplace," as asserted in Carter's Declaration, Filing 70-28 at 5 (¶ 30), and her statement of

---

[7] Karen Buche, the Director of Human Resources for Douglas County avers that the Complaint Summary "is a true and accurate copy of the investigation summary of the interviews conducted by Donnelly as part of Carter's complaint investigation in 2021." Filing 67-62 at 2 (¶ 5).

facts, Filing 72 at 10 (¶ 41). Indeed, Carter's allegation in her March 12, 2021, HR Complaint Questionnaire contradicts her statement in her Declaration and her statement of fact. It states,

> I did tell [Ewing] that I jumped at the chance to switch offices, because he always isolates me. I also told [Ewing] that my peers are anxious when interacting with me, because he constantly pounces on me and beats me down.

Filing 70-11 at 3 (explaining when Carter asked Ewing to stop the behavior in question). This statement shows that Carter did not tell Ewing to stop racial discrimination or racial harassment, which would have been protected conduct under Title VII and the NFEPA. Neither Carter's prior deposition testimony nor her statement during the investigation was unclear or indicated that Carter was previously confused, so that there was nothing further to explain or clarify; instead, ¶ 30 of Carter's Declaration was a "blatant contradiction." *Setchfield*, 109 F.4th at 1091.

Furthermore, the statement in ¶ 30 of Carter's Declaration is an attempt to "create[ ] an issue of fact where none existed before." *Id.* Carter testified that she did not know when Ewing knew of her complaints of racial discrimination or racial harassment, which would qualify as protected conduct under Title VII and the NFEPA. She never identified previously any evidence that Ewing knew of those complaints prior to taking the allegedly retaliatory action between March 18, 2021, and March 22, 2021, leading to a written reprimand, Filing 69 at 23 (¶ 81); Filing 67-26 at 1; Filing 72 at 17 (¶ 68).

Thus, the "sham" paragraph of Carter's Declaration will be "disregarded." *Garang*, 2 F.4th at 1122.

### 2. Paragraph 30 of Carter's Declaration Is Untimely Disclosed New Evidence

The County argues that this paragraph of Carter's declaration should be stricken for the further reason that it states information that Carter failed to disclose as required under Federal Rule of Civil Procedure 26(a), which warrants the sanction of exclusion under Federal Rule of Civil Procedure 37(c)(1). Filing 73 at 2. The Court agrees.

Federal Rule of Civil Procedure 26 requires compliance with discovery requests and supplementation of responses when new evidence is discovered. Fed. R. Civ. P. 26. "The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in [Federal Rule of Civil Procedure] 37." *See* *Petrone v. Werner Enters., Inc.*, 940 F.3d 425, 434 (8th Cir. 2019) (*Petrone I*) (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018)). Specifically, Rule 37(c)(1) provides, "If a party fails to provide information . . . as required by Rule 26(a)," then "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Thus, Rule 37(c)(1) is not applicable until the undisclosed evidence is used in a listed proceeding. *See* *Petrone I*, 940 F.3d at 435; *accord* *Petrone v. Werner Enters., Inc.*, 42 F.4th 962, 968 (8th Cir. 2022) (*Petrone II*) (emphasizing this point, citing *Petrone I*, 940 F.3d at 435). Rule 37(c)(1) is applicable here because Carter has used the information in ¶ 30 of her Declaration "on a motion," that is, in opposition to the County's Motion for Summary Judgment.

Bad faith is not required to bar untimely disclosed evidence if there is no justification. *Vanderberg*, 906 F.3d at 704. However, as the Eighth Circuit Court of Appeals has explained in more detail,

> "A district court 'has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case' when a party fails to provide information ... in compliance with Rule 26(a)." *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 644–45 (8th Cir. 2022) (quoting *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008)). In fashioning a remedy, courts should consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* at 645 (quoting *Wegener*, 527 F.3d at 692).

*Zick v. Paccar, Inc.*, 47 F.4th 672, 677 (8th Cir. 2022). As to "surprise and prejudice," even if a disclosure is inadequate, the complaining party must articulate how it was (or will be) prejudiced by the late disclosure. *Wallace v. Pharma Medica Rsch., Inc.*, 78 F.4th 402, 409 (8th Cir. 2023).

Here, Carter has not identified any basis for confusion in her deposition testimony that required clarification in her Declaration; instead, ¶ 30 of her Declaration blatantly contradicts her prior deposition testimony and other evidence in the record. Under Rule 26, Carter was obligated to disclose such new and completely different evidence, but she did not do so. Carter knew during the HR investigation what she had told Ewing, so there is no excuse for the failure to disclose such information. *Zick*, 47 F.4th at 677 (considering the reason for noncompliance). The County has also articulated how it has been prejudiced by the noncompliance. *Wallace*, 78 F.4th at 409. As the County argues, it would be "ambush[ed]" with nondisclosed information that contradicts the record established through discovery as a ploy to avert summary judgment. Filing 73 at 1; *see also* Filing 73 at 2 (asserting that Carter ignored her obligation to disclose the new information at several different times during the nearly two years the case had been pending). Allowing Carter to use ¶ 30 of her Declaration would disrupt the order and efficiency of the disposition of the County's Motion for Summary Judgment by belatedly and unexpectedly changing the factual basis for resolution of the Motion.

As to sanctions under Rule 37(c)(1), the district court has discretion to consider lesser sanctions than exclusion of the evidence, but "the district court's discretion to fashion a remedy or sanction for discovery violations under Rule 37 is not absolute." *Vanderberg*, 906 F.3d at 704 (quoting *Doe v. Young*, 664 F.3d 727, 734 (8th Cir. 2011)). Rather, the discretion "narrows as the severity of the sanction or remedy it elects increases." *Id.* (quoting *Young*, 664 F.3d at 734). Specifically, "[w]here the exclusion of evidence is tantamount to dismissal, a district court may need to first consider the possibility of lesser sanctions." *Id.* at 704–05. The party facing Rule 37(c)(1) sanctions has the burden to show its misconduct deserves only a lesser sanction, but "[t]he district court d[oes] not abuse its discretion by not imposing a lesser sanction when [that party]

never request[s] one." *Id.* at 705. Here, where the noncompliance concerns evidence that was essential to the question of whether Carter's protected activity was a motivating factor in the County's allegedly retaliatory actions, but Carter repeatedly failed to produce that evidence until the eleventh hour in opposition to summary judgment, only exclusion of the untimely disclosed evidence is appropriate. Exclusion of this evidence is not "tantamount to dismissal," even though its exclusion limits conduct by Carter that can be considered protected activity and consequently what conduct by Ewing can be considered retaliatory, where retaliation requires knowledge of the protected conduct. *See, e.g., Morris v. Dep't of Veterans Affs.*, 119 F.4th 536, 539 (8th Cir. 2024) ("Morris has failed to demonstrate that the person responsible for denying her the upgrade even knew about her protected activities, so we don't see how a reasonable jury could find a causal link between those activities and the denial of her pay upgrade.").

Pursuant to Rule 37(c), Carter will not be allowed to rely on ¶ 30 of her Declaration or any factual statements that depend upon ¶ 30 of her Declaration in opposition to the County's Motion for Summary Judgment. With this preliminary issue resolved, the Court turns to the merits of the County's Motion for Summary Judgment.

### C. Carter's Retaliation Claims

*1. Standards to Prove the Retaliation Claims*

As mentioned above, the substantive law determines what factual disputes matter at summary judgment. *Greater St. Louis Constr. Laborers Welfare Fund*, 76 F.4th at 757 ("The court determines materiality [of facts] from the substantive law governing the claim"; thus, only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998))); *Rusness*, 31 F.4th at 614 (explaining that material facts are ones "that might affect the outcome of the suit under the governing law" (internal quotations and citations omitted)). Carter's remaining

claims here are for retaliation in violation of Title VII and the NFEPA, so the Court will first address the law governing the relationship between those two claims.

The Eighth Circuit Court of Appeals has explained, "The NFEPA is patterned after federal law," and where neither party pointed to any differences between them, the Eighth Circuit concluded that its "analyses of [Plaintiff's] federal claims apply with equal force to [her] state claims." *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1061 n.2 (8th Cir. 2020) (case involving retaliation claims under Title VII and the NFEPA, quoting *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 825 n.7 (8th Cir. 2017)). Similarly, neither Carter nor the County asserts that there are any differences between Carter's NFEPA claim and her Title VII claim, so this Court will apply the same analysis to both claims. *Id.* This approach makes sense in light of the statutory prohibitions under the two acts. Title VII's antiretaliation provision forbids employer actions that "'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Similarly, the NFEPA forbids an employer from taking adverse action against an employee who "opposed any practice made an unlawful employment practice by the [NFEPA]" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the [NFEPA]." *See* Neb. Rev. Stat. § 48-1114(1)(a)–(b).

As to the federal standards applicable to the analysis of the retaliation claims, where—as here—there is "no evidence, direct or circumstantial, showing a specific link between [Carter] and any alleged retaliatory practices," the *McDonnell Douglas* framework applies. *Gibson*, 960 F.3d at 1064. Thus,

27

[A plaintiff] must first establish a prima facie case that would permit a reasonable jury to find that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) the adverse action was causally linked to the protected conduct. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). If [a plaintiff] establishes a prima facie case, the burden shifts to [the employer] to "show a legitimate ... reason for its actions." *See id.* at 1043. If such a reason is proffered, the burden then returns to [the plaintiff] to "present evidence that (1) creates a question of fact as to whether [the employer]'s reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation." *See id.* (internal quotation marks omitted).

*Gibson*, 960 F.3d at 1064.

Based on application of the *McDonnell Douglas* framework to the undisputed facts in this case, the County is entitled to summary judgment on Carter's Title VII and NFEPA retaliation claims. The "causal link" element of the prima facie case and the final "pretext" step in the framework are independently dispositive in this case.

### 2. The "Causal Link" Element of a Prima Facie Case of Retaliation

#### a. The Parties' Arguments

The County argues that a plaintiff cannot establish the causation element of a prima facie case of retaliation without evidence that the decisionmaker was aware of the protected activity. Filing 65 at 5. Furthermore, the County argues that awareness or knowledge must exist prior to initiating an investigation that ultimately results in an adverse employment action. Filing 65 at 5. However, the County argues that Carter's counseling, written reprimand, and suspension were all completed or initiated prior to Ewing having knowledge of any protected conduct. Filing 65 at 6. The County argues that it is undisputed that on March 22, 2021, when Ewing gave Carter a written reprimand and ordered her to EAP counseling, he did not know of her March 13, 2021, HR complaint or her March 18, 2021, NEOC charges; that Ewing had already started preparing paperwork for Carter's suspension the day before he learned of Carter's first NEOC charge on March 26, 2021; and that Ewing did not learn of Carter's HR complaint until April 14, 2021, at

the earliest. Filing 65 at 6. As to Carter's termination, the County acknowledges that Ewing knew of the first NEOC charge on March 26, 2021, and learned of the HR complaint on April 14, 2021, but the County argues that Ewing was not aware of the HR complaints from June or August when he started the paperwork leading to Carter's termination. Filing 65 at 7. The County argues that means that nearly four months passed between Ewing learning of protected activity and August 13, 2021, when he gave Carter notice of the pre-disciplinary hearing leading to her termination. Filing 65 at 7. The County argues that this time period "dilutes" any inference of a causal link. Filing 65 at 7. The County argues further that Ewing's concerns about Carter's job performance and behavior remained consistent throughout 2021 until Carter's termination, so that there was no escalation suggesting retaliation. Filing 65 at 10–11.

The Court rejected above in § II.B. Carter's argument that on March 12, 2021, while the development plan was in place, Carter explicitly instructed Ewing to stop the harassing behavior in the workplace that he was inflicting upon her because the affidavit asserting that fact was a "sham." Filing 68 at 8; Filing 68 at 16–17. However, Carter also argues that Ewing knew on March 26, 2021, about her first NEOC charge, which is the same day he gave her the pre-disciplinary notice for her suspension. Filing 68 at 9; Filing 68 at 17. She also asserts a close link between protected activity and her termination by pointing to her demand on June 22, 2021, that Ewing treat her with dignity and respect with a copy of the County's anti-harassment policy attached, and she also argues that on August 10, 2021, Ewing was aware that Carter had appealed the Civil Service Commission decision affirming her suspension. Filing 68 at 9; Filing 68 at 17. Carter also asserts that Ewing engaged in a pattern of deliberate and increasingly aggressive retaliatory actions shortly after she engaged in each incident of protected activity. Filing 68 at 18–20. Indeed, she

argues that Ewing "papered" her employment file to support adverse actions. Filing 68 at 15–16; Filing 68 at 20.

The County points out that Ewing had already warned Carter on March 11, 2021, that if her performance did not improve, she would be terminated, erasing any inference of a causal connection between Carter's allegedly protected activity and her counseling order and written reprimand. Filing 73 at 9. The County reiterates that at the time Ewing learned of Carter's first NEOC complaint on March 26, 2021, he had already expressed concerns about her performance and started preparing pre-disciplinary paperwork leading to Carter's suspension. Filing 73 at 9. The County argues that even if the Court considers Carter's August 10, 2021, "petition-in-error" to be protected activity—which the County disputes—Ewing had already started drafting the notice of pre-disciplinary hearing concerning her termination before that date. Filing 73 at 12. The County also reiterates that there was no pattern of escalating adverse actions after protected activity but only coincidences of timing coupled with lawful, obvious explanations for adverse actions. Filing 73 at 12–15.

### b. Carter Fails to Generate a Jury Question on the "Causal Link" Element of Her Prima Facie Case

Retaliation requires the decisionmaker to know of the plaintiff's protected conduct to establish the required causal connection between the protected activity and the allegedly adverse action. *See, e.g., Morris v. Dep't of Veterans Affs.*, 119 F.4th 536, 539 (8th Cir. 2024) ("Morris has failed to demonstrate that the person responsible for denying her the upgrade even knew about her protected activities, so we don't see how a reasonable jury could find a causal link between those activities and the denial of her pay upgrade."). Carter must raise an inference, *see Gibson*, 960 F.3d at 1064, and must ultimately prove, "that her opposition to unlawful discrimination was the 'but for' cause of the employer's adverse action." *Schottel v. Nebraska State Coll. Sys.*, 42

F.4th 976, 983 (8th Cir. 2022) (quoting *Porter v. City of Lake Lotawana*, 651 F.3d 894, 898 (8th Cir. 2011)). Thus, Carter must demonstrate—or at least point to evidence from which a reasonable jury could conclude—that Ewing, the decisionmaker responsible for the allegedly adverse actions against her, was aware of her protected activity when he began investigating her alleged misconduct. *Id.* In *Schottel*, where the decisionmaker stated under oath that he was unaware of the employee's allegedly protected complaints when he began investigating her alleged misconduct, and the person who received the employee's complaints confirmed under oath that he had not shared the employee's complaints with the decisionmaker, the lack of knowledge undermined a causal connection. *Id.*

The same is true here. There is no allegation of protected conduct prior to March 12, 2021, that is not a "sham." Thus, no reasonable jury could conclude that Ewing's placement of Carter on a "development plan" on February 19, 2021, was retaliatory. *See* Filing 69 at 12 (¶ 37); *Liberty Ins. Corp.*, 87 F.4th at 888 ("A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248)). On March 12, 2021, Carter submitted an "Employee Complaint Questionnaire" to Douglas County alleging that the development plan and Ewing's harassing conduct constituted race-based discrimination. Filing 72 at 11 (¶ 42). Ewing issued the order for counsel and a written reprimand to Carter on the afternoon of March 22, 2021. Filing 69 at 24 (¶ 87). However, Carter admits that she does not know whether Ewing was aware on March 22, 2021, of any complaints that she had filed alleging discrimination, and Ewing testified that he did not know about any HR or NEOC complaints at that time. Filing 69 at 24 (¶¶ 89–90); *Schottel*, 42 F.4th at 983 (holding that where the decisionmaker state under oath he did not know of protected conduct, an inference of causation was undermined). Carter also admits that she does not know whether on March 22, 2021, when

31

Ewing gave her a written reprimand, Ewing was aware of any complaints that she had filed alleging discrimination, and Ewing testified that he did not know about any HR or NEOC complaints at that time. Filing 69 at 24 (¶¶ 89–90); *Schottel*, 42 F.4th at 983. Although Ewing first learned of Carter's NEOC Charge of Discrimination when he received it on March 26, 2021, Filing 72 at 11 (¶ 45); Filing 69 at 41 (¶ 181), the same day he gave Carter the pre-disciplinary notice leading to her suspension, he had begun preparing the notice the day before. Filing 69 at 26 (¶ 98); *Schottel*, 42 F.4th at 983 (explaining that the decisionmaker responsible for the allegedly adverse actions against the employee must be aware of the employee's protected activity when he began investigating her alleged misconduct). Thus, no reasonable jury could find a causal connection between Carter's allegedly protected conduct and either her development plan, her reprimand, or her suspension. *Liberty Ins. Corp.*, 87 F.4th at 888.

Carter has also failed to point to any evidence from which a reasonable jury could conclude that there was a causal connection between Carter's protected activity and her termination. Although Carter relies on "temporal proximity" to establish the required causal link, "temporal proximity alone is insufficient to demonstrate a genuine issue of material fact as to whether conduct was retaliatory." *Schottel*, 42 F.4th at 984 (quoting *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1069 (8th Cir. 2017)). To put it another way, a coincidence of timing is insufficient to establish a case of retaliation. *Lissick v. Andersen Corp.*, 996 F.3d 876, 885–86 (8th Cir. 2021) (citing *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). As the Eighth Circuit explained in *Kipp*,

> We have stated that '[g]enerally, more than a temporal connection . . . is required to present a genuine factual issue on retaliation.' Our recent cases have made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge.

*Kipp*, 280 F.3d at 897. Although the Eighth Circuit has determined that a six-week period can "plausibly allege[ ] a but-for causal connection," the district court must also consider whether the employer "presents a lawful, obvious alternative explanation[ ] for the alleged conduct that renders [the employee's] theory of causation based on temporal proximity implausible." *Schottel*, 42 F.4th at 984 (cleaned up) (quoting *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017)).

In this case, the record is replete with evidence of the County's lawful, obvious alternative explanation for the allegedly retaliatory conduct that renders Carter's theory of causation based on temporal proximity implausible. *Id.* Indeed, no reasonable jury could find that any of the allegedly retaliatory conduct—not just Carter's termination—was connected to her protected activity by anything but coincidence. *Lissick*, 996 F.3d at 885–86 (mere coincidence does not establish retaliation); *Kipp*, 280 F.3d at 897 (same); *Liberty Ins. Corp.*, 87 F.4th at 888 (reasonable jury standard for summary judgment). The "lawful, obvious alternative explanation" here is Carter's long (and undisputed) history of unacceptable job performance including her insubordinate behavior, *see* Filing 69 at 23 (¶ 84), 24 (¶ 86), 36–37 (¶¶ 152–156); her refusal to follow directions concerning communications, *see* Filing 69 at 11 (¶ 36), 19 (¶ 62); her failure to continue with the EAP program, *see* Filing 69 at 41 (¶ 176); her repeated failure to submit reports in a timely manner and according to directions, *see* Filing 13–14 (¶ 40), 23 (¶ 80), 25 (¶¶ 92–93), 35 (¶ 143), 36 (¶ 149); and her inaccurate budget number and her admission that she had no evidence or factual basis to dispute that she provided an inaccurate budget number, *see* Filing 69 at 33–34 (¶¶ 133–134, 1136–137). Thus, even if the Court considers Carter's August 10, 2021, "petition-in-error" to be protected activity—and the Court doubts that it is—Ewing had already started drafting the notice of pre-disciplinary hearing concerning Carter's termination before that date. *See* Filing 69

33

at 29 (¶ 115) (undisputed allegation that on August 10, 2021, at 11:23 a.m., about seven hours before Carter alleges Ewing learned of her petition-in-error, Ewing created a document for a notice to Carter of a pre-disciplinary hearing and emailed it to Alexander and Manzitto); *see also Schottel, 42 F.4th at 983* (explaining that the decisionmaker responsible for the allegedly adverse actions against the employee must be aware of the employee's protected activity when he began investigating her alleged misconduct).

Furthermore, the long record of Carter's admitted misconduct defeats her contention of "papering" of her file. "Papering" of a targeted employee's employment record with unsubstantiated criticisms may support a prima facie retaliation claim particularly if coupled with lowered performance evaluations, reduced workloads, and special remedial training, or other evidence of retaliation. *See Ellis v. Houston, 742 F.3d 307, 323–24 (8th Cir. 2014)*. Here, the criticisms of Carter's workplace performance and behavior were not unsubstantiated but actually admitted. Also, absent some evidence of retaliatory motive, courts will not second-guess an employer's judgment of an employee's performance. *Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1080 (8th Cir. 2010)*. Thus, where there is an absence of facts demonstrating a retaliatory motive, and there is a detailed history of questionable performance or the absence of temporal proximity, "a reasonable jury could not find that the 'unfair' or 'unsupported' criticisms that [the employee] received were the result of unlawful retaliation." *Id.* In Carter's case, there is a detailed and undisputed history of questionable performance and a dearth of evidence beyond Carter's conclusory suppositions that any adverse action was taken for a retaliatory reason and not because of her misconduct.

Thus, Carter has failed to generate genuine issues of material fact on the first step in the *McDonnell Douglas* framework on her retaliation claims. This failure alone would warrant

summary judgment in the County's favor. Nevertheless, the Court will also consider the "pretext" step of the analysis.

### 3. The "Pretext" Step of the Analysis

Assuming for the sake of argument that Carter has generated genuine issues of material fact on her prima facie case, the detailed and undisputed history of Carter's questionable performance more than satisfied the County's obligation to "show a legitimate . . . reason for its actions." *Gibson*, 960 F.3d at 1064 (citation omitted). Thus, the Court turns next to the question of whether Carter can generate genuine issues of material fact that the County's reasons are pretextual and that generate a reasonable inference that the County acted in retaliation. *Id.* The Court begins consideration of that question with a summary of the parties' arguments.

### a. The Parties' Arguments

The County argues that Carter cannot show pretext to rebut Ewing's legitimate, non-retaliatory reasons for Carter's counseling, written reprimand, suspension, and termination. Filing 65 at 14. The County asserts, "The undisputed evidence overwhelmingly shows that Carter had real work performance and behavior issues even before her protected activity, and Ewing simply continued managing those issues." Filing 65 at 14. The County points to Carter's consistent inability to meet deadlines and follow instructions as well as her behavioral issues interacting with coworkers and her boss, topped off with her budget error that almost cost the Treasurer's Office nearly $200,000 in its budget. Filing 65 at 15–17. Furthermore, the County argues that Carter cannot point to evidence that creates a reasonable inference that retaliation was the real reason for her discipline and termination. Filing 65 at 18. The County points out that Carter's last performance review was over a decade before her termination and that she was put on a development plan about a month before she engaged in any protected activity. Filing 65 at 18–19. The County also points out that Carter cannot identify any similarly situated employees who also

engaged in protected activity but were treated more leniently. Filing 65 at 19. Furthermore, the County asserts that Ewing has always been consistent in his reasons for disciplining and terminating Carter. Filing 65 at 19. The County argues that Carter cannot establish that Ewing deviated from any policies, because Carter's allegations about HR's failure to investigate her complaints do not show that Ewing deviated from any policy. Filing 65 at 19. Also, the County argues that to the extent Carter alleges that Ewing deviated from Civil Service policy when he delayed imposing discipline between her suspension and her termination, Ewing has provided a logical non-retaliatory explanation that he did not think it was appropriate to take further disciplinary action until Carter's appeal was resolved. Filing 65 at 20. The County asserts that at bottom the reason for Carter's discipline and termination was undisputedly Carter's own work performance and behavior issues. Filing 65 at 20.

Carter argues that Ewing's "papering" of her employee file was pretextual and inconsistent with the Civil Service Commission Personnel Policy Manual and Ewing's own rules. Filing 68 at 21. She argues that both the Policy Manual and Ewing's own rules required disciplinary action to be taken in a timely manner, but that Ewing delayed raising any complaints about her audit reports in weekly meetings between February 19, 2021, and March 26, 2021, when Ewing gave Carter the pre-disciplinary notice leading to her suspension. Filing 68 at 22. Similarly, Carter argues that Ewing brought charges leading to Carter's termination on August 13, 2021, but he was aware of her inaccurate budget report by June 10, 2021. Filing 68 at 22. She argues that the notice leading to her termination was also months after alleged complaints about her behavior from April and June of 2021. Filing 68 at 23. Carter also argues that Ewing improperly "metamorphos[ed]" the counseling form into a disciplinary form to terminate her. Filing 68 at 24. She argues further that the mandatory EAP attendance was improper because there was no prior corrective action that had

been deemed unsuccessful. Filing 68 at 24. She argues that "papering" of her file makes the reasons stated unworthy of credence, Filing 68 at 24, and that Ewing's purported reason for delay in action while "papering" her file is not supported by any provision of the Policy Manual. Filing 68 at 33.[8]

The County replies that none of the alleged policy violations on which Carter relies is sufficient to allow an inference of pretext. Filing 73 at 15. Indeed, the County argues that alternative explanations for any such violations contradict any inference of retaliation. Filing 73 at 15. Most importantly, the County argues that there was nothing improper or suggestive of pretext in waiting to pursue termination when Carter's appeal of her suspension was pending where Ewing deemed it appropriate to wait before deciding on what further discipline would be appropriate. Filing 73 at 15–16. The County also points out that Carter admits that the bases for her suspension and termination are true. Filing 73 at 17.

### b.   Carter Fails to Generate a Jury Question on Pretext

"Evidence of pretext 'is viewed in light of the employer's justification.'" *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 694 (8th Cir. 2021) (quoting *Hutton v. Maynard*, 812 F.3d 679, 685 (8th Cir. 2016)), *cert. denied*, 142 S. Ct. 1361 (2022). Consequently, "[c]reating a genuine issue of material fact regarding pretext requires more substantial evidence than it takes to make a prima facie case." *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021). "To show pretext, the [employee] must both discredit [the employer's] proffered reasons for the alleged retaliatory action and show that the circumstances permit drawing a reasonable inference that retaliation was the real reason for the adverse employment action." *Schottel*, 42 F.4th at 984 (quoting *Sellars*, 13 F.4th at 694).

---

[8] The remainder of Carter's arguments on the issue of pretext are essentially the same as earlier arguments that the Court has already rejected. *See* Filing 68 at 27–33.

As the Eighth Circuit has explained,

> "There are at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). "In either case, the plaintiff must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Fiero v. CSG Sys., Inc*., 759 F.3d 874, 878 (8th Cir. 2014) (internal quotation marks omitted).

*Thompson v. Univ. of Arkansas Bd. of Trs.*, 52 F.4th 1039, 1042 (8th Cir. 2022) (noting that 1981 retaliation claims then before the court use the same *McDonnell Douglas* framework as Title VII claims); *see also Said v. Mayo Clinic*, 44 F.4th 1142, 1150 (8th Cir. 2022) (Title VII case recognizing the same two methods of proving pretext). "[T]o survive summary judgment [a plaintiff] need not definitively prove that her employer's reason for firing her was pretextual— rather, she simply must 'adduc[e] enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" *Hairston*, 6 F.4th at 843 (quoting *Gibson v. Am. Greetings Corp*., 670 F.3d 844, 854 (8th Cir. 2012)).

The Court concludes that Carter has failed to adduce enough admissible evidence to raise a genuine doubt as to the legitimacy of the County's motives for disciplining and terminating her. *See id.* This is true, whether Carter attempts to do so by showing that the proffered explanation has no basis in fact or attempts to persuade the Court that a prohibited reason is more likely the County's motivation. *See Said*, 44 F.4th at 1150.

"[T]he critical inquiry . . . is not whether the employee actually engaged in the conduct for which he [or she] was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct[.]" *Said*, 44 F.4th at 1151 (cleaned up) (quotation marks and citation omitted); *Hairston*, 6 F.4th at 843 n.3 (same). However, in Carter's case, the good faith of the County's belief that Carter had engaged in misconduct is unquestionably established by the

undisputed history of Carter's performance and behavior problems. The Court concluded above in § II.C.2.b. that the long record of Carter's admitted misconduct defeats her contention of "papering" of her file. The undisputed record here is also such that no reasonable jury could find that the County had no basis in fact for its adverse employment actions. *See Said*, 44 F.4th at 1150 (first method of proving pretext). It is also such that no reasonable jury could be persuaded that a prohibited reason more likely motivated Carter's discipline and termination than her performance and behavior problems. *See id.* (second method). Apart from Carter's conclusory assertions that the underlying actions of the County that she reported were discriminatory or harassing based on race, the record is devoid of evidence of any motivation other than her performance and behavior problems for those underlying actions. Ewing and Carter are both African Americans. That fact "run[s] counter to any reasonable inference of discrimination" or retaliation. *See Nash v. Optomec, Inc.*, 849 F.3d 780, 783 (8th Cir. 2017). Indeed, the Court finds that no reasonable jury could conclude on this record that Carter had the required "objectively reasonable belief that an actionable Title VII violation has occurred [based on race] for [her] complaint to qualify as a protected activity." *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021) (quoting *Gibson*, 960 F.3d at 1064).

Similarly unavailing is Carter's assertion that Ewing delayed proceedings leading to termination in violation of County policies and his own policies. Carter is correct to the extent that an employer's toleration of undesirable conduct for an extended period of time, then disciplining the employee shortly after he or she engages in protected conduct in reliance on that longstanding undesirable conduct, can give rise to an inference of retaliation. *Hairston*, 6 F.4th at 844. Also

> "[a]lthough an employer's violation of its own policies may be indicative of pretext, that is not always so" as "[a]n employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not

unlawfully discriminate in doing so." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (citations omitted).

*Winters v. Deere & Co.*, 63 F.4th 685, 691 (8th Cir. 2023). Thus, even if an employer violated its own policy, the employee must show how the employer discriminated against him or her. *Id.* Here, Ewing "can certainly choose how to run" the County Treasurer's Office's business and choose when to impose discipline including termination. *Id.* As explained above, there is no reasonable inference of retaliatory intent in the record, and Ewing reasonably explained that his delay in pursuing Carter's termination was based on his belief that further discipline should not be imposed pending Carter's appeal of the suspension. Filing 69 at 28 (¶¶ 109–110). Carter's assertion that Ewing, as the Treasurer, had the authority to terminate employees without a hearing, Filing 69 at 28 (¶ 109), which is apparently offered to suggest that Ewing's delay was improper, actually is an admission that Ewing was more generous than necessary in waiting to see the outcome of her appeal before imposing further discipline and in considering the possibility that further discipline should be adjusted in light of the outcome of her appeal. There is no reasonable inference that Ewing tolerated undesirable conduct, then pounced on the opportunity to retaliate when Carter engaged in protected conduct. *See Hairston*, 6 F.4th at 844.

The Court also finds no reasonable inference that Ewing improperly used the counseling form as a disciplinary form or improperly required mandatory EAP attendance without a prior corrective action that had been deemed unsuccessful. *See* Filing 68 at 24. The Supervisor Documentation of Employee Counseling that Ewing gave Carter on March 22, 2021, states, "This is *NOT A DISCIPLINARY FORM*. This form is to be used only to create a written record that you counseled a particular employee about a specific problem." Filing 70-13 at 2 (emphasis in the original). However, the form also states, "Another incident may result in (circle one): oral or written reprimand," with "written" circled. Filing 70-13 at 2. Thus, the counseling form explicitly

stated that it could lead to discipline. Where neither the March 11, 2021, warning of possible termination if Carter's performance did not improve, Filing 69 at 22 (¶ 78), nor the counseling form issued on March 22, 2021, had improved Carter's performance during meetings later that day, Ewing issued Carter a written reprimand and ordered her to attend the EAP. Filing 69 at 24 (¶ 88). No reasonable jury could conclude on this record that ordering Carter to attend the EAP was retaliatory or that it did not follow corrective action that was unsuccessful. *Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment).

Finally, the Court finds no inference of retaliation in Carter's discipline because it followed a thirteen-year period between 2009 and early 2021 during which Carter received no workplace counseling, reprimands, or suspensions for poor performance or behavior. Filing 72 at 3 (¶ 12). "[A]n employee's technical competency does not shield him [or her] from discipline for misconduct." *Said*, 44 F.4th at 1150. Similarly, "evidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination." *King v. Guardian ad Litem Bd.*, 39 F.4th 979, 987 (8th Cir. 2022) (quoting *Main v. Ozark Health, Inc.*, 959 F.3d 319, 326 (8th Cir. 2020)). Thus, Carter's prior good performance does not protect her from the consequences of bad performance in 2021. It is also well-settled that it is unlikely that a person who hired a member of a protected class would then fire that person based on her membership in that protected class or in retaliation for complaints about harassment based on her protected class. *See Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009) (citing *Calvin v. Yellow Freight Sys., Inc.*, 218 F.3d 904, 906–07 (8th Cir. 2000)). In this case, Ewing both hired and fired Carter making it unlikely that the termination was based on race or in retaliation for complaints about harassment based on race. Carter points to no evidence generating a contrary inference in this case.

Thus, Carter has failed to generate genuine issues of material fact on the last step in the *McDonnell Douglas* framework on her retaliation claims, so the County is entitled to summary judgment on those claims.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that the County's Motion for Summary Judgment, Filing 64, is granted, and the County is entitled to judgment as a matter of law on Carter's Title VII and NFEPA retaliation claims; and

IT IS FURTHER ORDERED that, where the only other claim previously at issue in this case, Carter's equal protection claim, was previously dismissed, a separate judgment will now enter in favor of the County and Ewing and against Carter ending this action.

Dated this 26th day of November, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge